**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | |
|---|---|
| ASHLEY FARROW, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>DEERE & COMPANY and JOHN DEERE CONSUMER PRODUCTS, INC.<br><br>Defendants. | **CIVIL ACTION NO:** 4:26-cv-00087-WMR<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Ashley Farrow, ("Plaintiff"), individually and on behalf of all others similarly situated, respectfully submits the following Amended Class Action Complaint against Defendants Deere & Company and John Deere Consumer Products Inc., (collectively known as "John Deere", "Deere", "Defendants") Plaintiff makes the following allegations, except as to allegations specifically pertaining to Plaintiff, upon information and belief based on, among other things, the investigation of counsel, and review of public documents.

**INTRODUCTION**

1.      This is a consumer class action arising from Defendants' design, manufacture, marketing, distribution, and sale of defective John Deere riding mower gauge assemblies used on John Deere S100-series riding mowers. ("Class Mowers")

2.      The subject gauge assembly is not a cosmetic or incidental component. It serves important functions for mower owners by tracking fuel level and engine hours of use. Engine-hour

1

tracking is especially important because it allows consumers to monitor maintenance intervals and routine service necessary to keep the mower operating properly and efficiently.

3.  The defect at issue is straightforward. The subject gauge assembly is powered by a small internal lithium coin-cell/button battery. That battery is a low-cost consumable component, typically worth only a few dollars. But rather than designing the gauge so that the battery can be replaced in an ordinary and inexpensive manner, Defendants designed and sold the gauge assembly such that, when the battery dies, consumers are forced to replace the entire gauge assembly. The ("Defect")

4.  In other words, Defendants transformed what should be a simple and inexpensive battery replacement into a recurring replacement-part purchase costing consumers more than $50 each time the battery fails. The result is that owners of the Class Mowers are required to pay disproportionately high replacement costs over the ordinary life of the mower for a problem that should instead be remedied by replacing a common button-cell battery.

5.  The Defect is not that batteries eventually lose power. That is entirely foreseeable. The Defect is that Defendants designed, manufactured, and sold the subject gauge assembly in a manner that allegedly prevents consumers from replacing the low-cost battery without destroying the gauge itself, thereby forcing the purchase of a replacement unit when predictable battery depletion occurs.

6.  Plaintiff Ashley Farrow experienced exactly this problem. Plaintiff purchased a John Deere riding mower from Lowe's in 2023. After ordinary use, the battery in the mower's gauge assembly failed. Because the battery could not be replaced in a simple, reasonable, and economical manner, Plaintiff was forced to purchase a new replacement gauge assembly at substantial cost.

7.      Plaintiff and similarly situated consumers were harmed because they paid more for their mowers and replacement gauges than they otherwise would have paid had Defendants disclosed the true nature of the gauge design. They also suffered out-of-pocket losses when forced to replace the entire gauge assembly instead of a cheap internal battery.

8.      Upon information and belief, this is not an isolated incident. The issue has been reported by numerous John Deere owners across multiple consumer and enthusiast forums and complaint channels, reflecting a recurring problem associated with the subject gauge assemblies.

9.      Despite the predictable nature of battery depletion, the low cost of the failed component, and the recurring burden imposed on consumers, Defendants have continued to profit from the sale of replacement gauge assemblies rather than providing consumers with a reasonable, economical, and non-defective solution.

10.      Plaintiff brings this action on behalf of himself, a proposed nationwide class, and a proposed Georgia subclass to recover damages, restitution, and other relief arising from Defendants' defective and unfair conduct.

## JURISDICTION AND VENUE

11.      Plaintiff incorporates all previous paragraphs as asserted herein.

12.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the proposed classes, and at least one member of the proposed classes is a citizen of a state different from at least one Defendant.

13.      This Court has personal jurisdiction over Defendants because Defendants have purposefully availed themselves of the privilege of conducting substantial business in Georgia and

3

in this District, including by designing, manufacturing, marketing, distributing, warranting, and selling John Deere riding mowers, replacement gauge assemblies, and related parts to consumers in Georgia and throughout this District.

14. Defendants have further placed the subject products into the stream of commerce with the expectation that they would be purchased and used by consumers in Georgia, including in this District.

15. Plaintiff is a citizen and resident of Georgia. Plaintiff purchased the subject mower in Georgia and, after the subject gauge failed, purchased a replacement John Deere gauge that was shipped to Menlo, Georgia.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, including Plaintiff's purchase, ownership, use, manifestation of the Defect, and replacement purchase of the subject gauge assembly in Georgia.

17. Venue is also proper in this Court because Defendants are subject to personal jurisdiction in this District and therefore reside in this District for venue purposes.

## PARTIES

18. Plaintiff incorporates all previous paragraphs as asserted herein.

19. Plaintiff Ashley Farrow ("Plaintiff") is a natural person and citizen of the State of Georgia. Plaintiff resides in Menlo, Georgia and is therefore a citizen of Georgia for purposes of diversity jurisdiction. Menlo, Georgia is located within Chattooga County Georgia.

20. In or about 2023, Plaintiff purchased a John Deere riding mower from a Lowe's Department store in Georgia for personal, family, or household use.

4

21. The mower Plaintiff purchased was equipped with the subject gauge assembly, including the hour meter and fuel indicator system described herein.

22. After ordinary use, the gauge assembly failed when its internal battery lost power.

23. As a direct and proximate result of the Defect alleged herein, Plaintiff was forced to purchase a replacement John Deere gauge assembly, identified as part number AUC15098, at a cost of $62.98. The replacement purchase was shipped to Plaintiff in Menlo, Georgia.

24. Plaintiff suffered economic injury, including but not limited to out-of-pocket loss, overpayment, loss of the benefit of the bargain, and diminution in value, and he would not have purchased the mower and/or replacement gauge, or would have paid less for them, had Defendants disclosed the true nature of the Defect.

25. Defendant Deere & Company ("Deere") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Moline, Illinois.

26. Upon information and belief, Deere may be served through its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801. Public Delaware court records have identified Deere & Company's registered agent as The Corporation Trust Company at that address.

27. Deere transacts substantial business throughout the United States, including in Georgia and in this District, and at all relevant times designed, manufactured, marketed, distributed, warranted, and/or sold John Deere riding mowers, component parts, and replacement parts, including the subject products described herein.

28. Defendant John Deere Consumer Products, Inc. ("JDCP") is, upon information and belief, a corporation organized and existing under the laws of the State of Delaware. Upon

information and belief, JDCP may be served through its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

29.     Upon information and belief, JDCP transacts substantial business throughout the United States, including in Georgia and in this District, and at all relevant times designed, manufactured, marketed, distributed, warranted, serviced, and/or sold John Deere consumer mower products, component parts, and replacement parts, including the subject gauge assemblies at issue in this action.

30.     At all relevant times, Defendants acted individually and in concert with one another and participated in the design, manufacture, testing, marketing, distribution, sale, servicing, and profiting from the subject products.

## FACTUAL ALLEGATIONS

31.     Defendants designed, manufactured, marketed, distributed, and sold John Deere riding mowers and related component parts, including the fuel gauge and hour meter assemblies used on certain John Deere S100-series riding mowers.

32.     Upon information and belief, the subject products include the "MowerPlus" combination fuel gauge and hour meter used on John Deere S100-series riding mowers, including models such as the S110, S120, S130, S140, S160, S170, and S180.

33.     The subject gauge assembly is not merely cosmetic. It performs important functions for mower owners by tracking fuel level and hours of engine use.

34.     The gauge's hour-meter function is material because it allows owners to track service and maintenance intervals necessary to keep the mower operating efficiently and as intended.

35. The Defect at issue arises from the gauge assembly's internal power source. Upon information and belief, the subject gauge is powered by an internal lithium button-cell battery, including a common CR2032-type coin-cell battery.

36. A button-cell battery is a low-cost consumable component. In ordinary use, such batteries predictably lose power over time and eventually require replacement.

37. The Defect is not that the battery eventually dies. That is foreseeable. The Defect is that Defendants allegedly designed and sold the subject gauge assembly so that the internal battery cannot be replaced in an ordinary, non-destructive, and economical manner.

38. Consumers who have disassembled the subject gauge report that the battery is welded in place or otherwise configured such that it cannot be replaced without destroying the gauge assembly.

39. As a result, when the internal battery fails, consumers are forced to purchase an entirely new gauge assembly instead of replacing a common battery that would otherwise cost only a few dollars.

40. Upon information and belief, John Deere sells replacement gauges for approximately $55 to $70 depending on model, and some dealers or retailers advertise them at even higher prices.

41. In other words, Defendants' design transforms what should be a simple and inexpensive battery replacement into a recurring replacement-part purchase costing consumers many times the value of the failed internal component.

42. Upon information and belief, the battery often lasts long enough for many owners to be at or just beyond the applicable express warranty period before failure occurs. Public owner reports reflect failures after roughly two years of ownership and at relatively low operating hours.[1].

**Defendants Knowledge and Concealment of the Defect Prior to Sale**

43. Upon information and belief, Defendants knew of this Defect prior to the manufacture and sale of the Class Mowers. Defendants knew of the Defect through, or evidenced by, sources such as pre-release design and testing information; replacement part sales data; early consumer complaints; and other internal sources unavailable to Plaintiff without discovery.

44. Public owner complaints concerning the same gauge failure appear across multiple online forums, including Green Tractor Talk[2], Homesteading Today[3], My Tractor Forum[4], and Lawn Mower Forum.

45. Public owner complaints further reflect that consumers have complained directly to John Deere regarding this problem. In one such complaint, an owner reported that, after contacting John Deere customer service about a failed digital fuel/hour meter on an S170 purchased in April 2022 with only about 20 hours of use, a John Deere representative stated that "the meter is designed to last the LIFETIME of the machine," but the owner was later told by the dealer that John Deere would not replace the meter[5].

46. In at least one public owner complaint, the owner reported that John Deere customer service stated that "the meter is designed to last the LIFETIME of the machine," yet the

---

[1] https://www.lawnmowerforum.com/threads/digital-fuel-hour-meter-stopped-working.77662/
[2] https://www.greentractortalk.com/threads/s160-mowerplus-fuel-gauge-not-working.236735/?utm_source=chatgpt.com
[3] https://www.homesteadingtoday.com/threads/bad-jd-fuel-gauge.630005/?utm_source=chatgpt.com
[4] https://www.mytractorforum.com/threads/hour-meter-gauge-problems.1394305/?utm_source=chatgpt.com
[5] https://www.lawnmowerforum.com/threads/digital-fuel-hour-meter-stopped-working.77662/

owner was later told Deere would not replace the failed meter and instead could purchase a new one for $87[6].

47.    Public owner discussions also reference aftermarket replacement hour meters available online at materially lower prices, including models in approximately the $25 range, with some users reporting that certain alternatives have replaceable batteries or operate without an internal battery at all.

48.    Defendant possessed pre-sale knowledge that the gauge assembly installed in the Class Mowers incorporated an internal battery with a finite and predictable service life.

49.    Defendant designed the gauge assembly so that the internal battery was permanently enclosed within the assembly and could not be reasonably replaced by consumers or service technicians without replacing the entire gauge assembly.

50.    Defendant knew before Plaintiff's purchase that failure of the internal battery would render the gauge assembly partially or completely inoperable and would require replacement of the entire assembly despite the failure of only a low-cost battery component.

51.    Defendant acquired knowledge of the Defect through sources not available to consumers, including pre-production testing, durability testing, warranty claims, dealer repair reports, customer complaints, replacement-part sales data, and other post-sale monitoring activities.

52.    The Defect manifests in a sufficiently uniform manner and at a sufficiently recurring rate that Defendant knew or should have known that owners of the Class Mowers would incur replacement costs substantially disproportionate to the value of the failed battery component.

---

[6] https://www.lawnmowerforum.com/threads/digital-fuel-hour-meter-stopped-working.77662/

53. Defendant had exclusive access to material facts concerning the design, expected lifespan, failure characteristics, and serviceability of the gauge assembly. Such information was not reasonably available to consumers before purchase.

54. Despite its knowledge, Defendant failed to disclose to Plaintiff and Class Members that the gauge assembly contained a non-serviceable battery with a predictable limited lifespan and that failure of the battery would necessitate replacement of the entire gauge assembly.

55. Reasonable consumers would not expect that the failure of a battery costing only a small fraction of the assembly's replacement cost would require replacement of the entire gauge assembly.

56. Had Defendant disclosed the true nature of the Defect, Plaintiff and Class Members would not have purchased the Class Mowers, would have paid substantially less for them, or would have chosen alternative products.

57. Defendant's omissions were material because they concerned the expected durability, maintenance requirements, repair costs, and useful life of a component integral to the operation and monitoring functions of the mowers.

**Fraudulent Concealment Allegations**

58. Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Deere & Company or John Deere Consumer Products, Inc. responsible for concealing the above alleged information regarding the Class Mowers. Defendants are in possession of or have access to all of this information. Plaintiff's claims arise out of Defendant's fraudulent concealment of the Defect. To the extent that Plaintiff's claims arise from Defendants' fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiff bases his claims.

10

Plaintiff alleges that at all relevant times, including specifically at the time he purchased one of the Class Mowers, Defendants knew, or were reckless in not knowing, of the Defect; Defendants were under a duty to disclose the Defect based upon their exclusive knowledge of it and concealment of it; and Defendants never disclosed the Defect to Plaintiff or the public at any time or place or in any manner.

59.    Who: Defendants actively concealed the Defect from Plaintiff and Class Members. Plaintiff is unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Deere & Company and John Deere Consumer Products, Inc. responsible for such decisions.

60.    What: Defendants' concealment and omission of material facts concerning the MowerPlus fuel gauge assembly, including but not limited to: (a) the existence of a sealed, non-serviceable internal battery with a finite useful life; (b) the predictable depletion and failure of the battery through ordinary use and aging; (c) the inability of consumers to replace the battery separately from the fuel gauge assembly; (d) the requirement that consumers replace the entire fuel gauge assembly when the battery fails; (e) the substantial replacement costs associated with replacement of the entire assembly; and (f) the existence of feasible alternative designs that would have permitted replacement of the battery without replacement of the entire assembly.

61.    When: Defendants concealed material information before and at the time of sale of the Class Mowers and continued thereafter. Upon information and belief, Defendants possessed knowledge of the omitted facts before Plaintiff and Class Members purchased the Class Mowers and continued to conceal such information throughout the warranty and post-warranty periods.

62.    Where: Defendants' marketing materials, product literature, owner's manuals, warranty materials, websites, dealer communications, point-of-sale materials, and other

communications directed to purchasers and prospective purchasers of the Class Mowers. Defendants failed to disclose the omitted facts in these materials and communications despite possessing knowledge of the Defect and its consequences.

63.     How: Defendants marketed, promoted, and sold the Class Mowers while failing to disclose that the fuel gauge assembly contained a non-serviceable internal battery that would predictably fail during the useful life of the mower and require replacement of the entire fuel gauge assembly. Defendants thereby deprived Plaintiff and Class Members of material information concerning the durability, serviceability, maintenance costs, and ownership costs of the Class Mowers.

64.     Why: Defendants' disclosure of the omitted facts would have revealed that the fuel gauge assembly contained a non-serviceable consumable component that would predictably require replacement of the entire assembly upon depletion of a low-cost internal battery. Upon information and belief, Defendants concealed these facts to avoid negatively affecting consumer demand for the Class Mowers, to prevent consumers from comparing the Class Mowers to competing products with more serviceable designs, to maintain the prices charged for the Class Mowers, and to avoid disclosing ownership and maintenance costs associated with the fuel gauge assembly.

65.     Upon information and belief, Defendants further concealed these facts because disclosure would have informed consumers that replacement of a low-cost battery component would require purchase of an entire replacement fuel gauge assembly, thereby increasing the likelihood that consumers would delay, reconsider, or decline their purchases, or demand a lower purchase price.

12

66. Upon information and belief, Defendants benefitted financially from concealing the Defect because consumers purchased Class Mowers without knowledge of the Defect and later incurred costs associated with replacement of the fuel gauge assembly when the internal battery reached the end of its useful life.

**Plaintiff's Experience**

67. Plaintiff Ashley Farrow is one of the consumers harmed by this Defect.

68. In or about 2023, Plaintiff purchased a John Deere riding mower from Lowe's for personal, family, or household use.

69. The mower Plaintiff purchased included the subject gauge assembly described herein- i.e the Defect.

70. After ordinary use, the gauge assembly failed when its internal battery lost power.

71. The gauge is important to ordinary mower use because it tracks fuel level and engine hours, and the hour meter helps determine when the mower should be serviced and maintained.

72. Because the battery in the gauge could not be replaced in a simple, reasonable, and economical manner, Plaintiff was forced to purchase an entirely new replacement gauge assembly.

73. On or about March 30, 2026, Plaintiff purchased a replacement John Deere gauge identified as part number AUC15098. The order confirmation reflects that the replacement gauge cost Plaintiff $62.98 and was shipped to Plaintiff in Menlo, Georgia.

74. Plaintiff thus suffered actual economic loss, including an out-of-pocket replacement cost caused by the Defect alleged herein.

75. Had Plaintiff known at the time of purchase that the subject gauge assembly contained a low-cost battery that could not be ordinarily replaced and would instead require full-

unit replacement when the battery died, Plaintiff would not have purchased the mower and/or replacement gauge or would have paid less for them.

76.     Likewise, had Plaintiff and class members known that what should have been a $1 to $2 battery replacement would instead become a $50-plus gauge replacement, they would not have purchased the subject products or would have paid significantly less.

77.     Defendants have profited, and continue to profit, from the sale of replacement gauge assemblies made necessary by the alleged non-serviceable battery design.

78.     Plaintiff and class members have been deprived of the benefit of their bargain and have suffered monetary loss as a direct and proximate result of Defendants' conduct.

79.     Plaintiff provided Defendants with written pre-suit notice of the Defect, breach, and resulting damages contemporaneously with, and no later than, the filing of this action, thereby satisfying any applicable notice requirement.

## CLASS ACTION ALLEGATIONS

80.     Plaintiff incorporates the previous paragraphs as if fully set forth herein.

81.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and the following proposed classes:

> **National Class:** All persons in the United States who purchased, owned, paid to replace, or otherwise incurred out-of-pocket costs for one or more of the subject John Deere fuel gauge/hour meter assemblies used in the relevant John Deere S100-series riding mowers, within the applicable statute of limitations period.

> **Georgia Subclass:** All persons in the State of Georgia who purchased, owned, paid to replace, or otherwise incurred out-of-pocket costs for one or more of the subject

John Deere fuel gauge/hour meter assemblies used in the relevant John Deere S100-series riding mowers, within the applicable statute of limitations period.

82. The National Class and Georgia Subclass are collectively referred to herein as the "Classes."

83. Excluded from the Classes are Defendants; any entity in which Defendants have a controlling interest; Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns; the judicial officers to whom this case is assigned and any member of their immediate families; and any person who timely and validly requests exclusion from the Classes.

84. Plaintiff reserves the right to amend, modify, or refine the class definitions following discovery and further investigation.

85. This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

86. **Numerosity — Rule 23(a)(1):** The members of the Classes are so numerous that joinder of all members is impracticable. Upon information and belief, the subject gauge assemblies were installed in and sold with numerous John Deere riding mowers and were also sold separately as replacement parts to consumers throughout the United States, including in Georgia. The identity of Class members is ascertainable from Defendants' records, dealer records, retailer records, warranty records, online sales records, and other reasonably available means.

87. **Commonality — Rule 23(a)(2):** There are questions of law and fact common to Plaintiff and the Classes, and those questions generate common answers apt to drive the resolution of this litigation. Common questions include, without limitation:

a. whether the subject gauge assemblies contain an internal battery that is not reasonably replaceable by consumers;

15

b. whether Defendants designed the subject gauge assemblies so that predictable battery depletion requires replacement of the entire gauge assembly;

c whether the subject gauge assemblies are defective;

d. whether Defendants knew or should have known of the alleged Defect;

e. whether Defendants failed to disclose material information concerning the alleged Defect;

f. whether the subject gauge assemblies were fit for their ordinary purpose;

g. whether Defendants breached the implied warranty of merchantability;

h. whether Defendants were unjustly enriched by the sale of the subject gauge assemblies and replacement gauges;

i. whether a reasonable alternative design existed;

j. whether Plaintiff and Class members suffered economic injury as a result of the alleged Defect; and

k. whether Plaintiff and the Classes are entitled to damages, restitution, equitable relief, or other relief.

88.     **Predominance — Rule 23(b)(3):** The common questions of law and fact predominate over any questions affecting only individual members of the Classes. This case centers on a common course of conduct by Defendants and a common product design issue—namely, whether Defendants sold gauge assemblies containing a low-cost internal battery that, when predictably depleted, allegedly cannot be replaced in an ordinary and economical manner, thereby forcing consumers to purchase an entirely new gauge assembly. The relevant evidence regarding Defendants' product design, knowledge, marketing, sales practices, and replacement-part practices will be common to Plaintiff and the Classes.

89.    **Typicality — Rule 23(a)(3):** Plaintiff's claims are typical of the claims of the Classes because Plaintiff, like all Class members, purchased and used a mower and/or replacement gauge assembly containing the same alleged Defect and was injured by the same alleged conduct. Plaintiff's claims arise from the same factual and legal theories as the claims of the absent Class members.

90.    **Adequacy — Rule 23(a)(4):** Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff's interests are aligned with those of the Classes, and Plaintiff has retained counsel competent and experienced in class action litigation, consumer litigation, and complex product-Defect cases.

91.    **Superiority — Rule 23(b)(3):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages or other financial recovery available to individual Class members are relatively modest compared with the burden and expense of individual litigation, making it impracticable for Class members to individually seek redress for Defendants' conduct. Class treatment will also avoid inconsistent adjudications, conserve judicial resources, and promote efficient resolution of the claims of Plaintiff and the Classes.

92.    Absent a class action, Defendants will likely retain the benefit of their alleged wrongful conduct, and Class members will likely be unable to obtain effective relief because the cost of pursuing individual actions would substantially exceed the expected individual recovery.

93.    Class certification is also appropriate under Rule 23(c)(4) with respect to particular issues, including but not limited to whether the subject gauge assemblies share a common defective design, whether Defendants knew or should have known of the Defect, whether Defendants failed to disclose the Defect, and whether Defendants' conduct caused common economic injury.

94.    Plaintiff knows of no unusual difficulties likely to be encountered in the management of this action as a class action.

**CAUSES OF ACTION**
**COUNT I**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

95.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

96.    Defendants are merchants engaged in the business of designing, manufacturing, marketing, distributing, selling, and warranting consumer lawn and garden equipment, including the subject John Deere riding mowers, gauge assemblies, and replacement gauge parts at issue in this action.

97.    At all relevant times, Defendants sold goods, including the subject gauge assemblies and replacement gauges, that carried an implied warranty of merchantability.

98.    The implied warranty of merchantability required that the subject goods be fit for the ordinary purposes for which such goods are used, pass without objection in the trade under the contract description, and conform to the promises or affirmations of fact made on the container or label, if any.

99.    The subject gauge assemblies were not merchantable and were not fit for their ordinary purpose when sold because, among other things, they contained an internal button-cell battery that predictably depletes during ordinary use yet was allegedly designed and configured so that it could not be replaced in a simple, reasonable, non-destructive, and economical manner.

100.    As a result of that design, when the internal battery failed—as was foreseeable and inevitable in ordinary use—consumers were forced to replace the entire gauge assembly rather than replace the low-cost battery component.

101.    A gauge assembly that requires replacement of the entire unit upon predictable depletion of a trivial internal battery component is not fit for its ordinary purpose over a reasonable product life and is not of merchantable quality.

102.    The Defect existed at the time the subject goods left Defendants' control and at the time of sale because the alleged non-serviceable battery design was inherent in the product as designed, manufactured, and sold.

103.    Plaintiff Ashley Farrow purchased a John Deere riding mower in 2023 and, after the gauge failed in ordinary use, was forced to purchase a replacement John Deere gauge, part number AUC15098, for $62.98.

104.    Plaintiff used the subject product in a foreseeable and ordinary manner.

105.    Plaintiff and members of the Classes were harmed as a direct and proximate result of Defendants' breach of the implied warranty of merchantability.

106.    Plaintiff and members of the Classes suffered damages, including but not limited to out-of-pocket losses, overpayment, loss of the benefit of the bargain, diminution in value, and the cost of replacing allegedly defective gauge assemblies that should not have required full-unit replacement.

107.    Plaintiff provided Defendants with written notice of the Defect, breach, and resulting damages contemporaneously with, and no later than, the filing of this action, thereby satisfying any applicable notice requirement.

108.    Any limitation, disclaimer, or exclusion of implied warranties asserted by Defendants is ineffective, inapplicable, unconscionable, and/or fails of its essential purpose under the facts alleged herein, including because the Defect was latent, inherent in the design, and not reasonably discoverable by ordinary consumers at the time of purchase.

109. Upon information and belief, the battery often lasts long enough for many owners to be at or just beyond the applicable express warranty period before failure occurs. Public owner reports reflect failures after roughly two years of ownership and at relatively low operating hours.[7].

110. Under the circumstances, Defendant's limitation of its express warranty (and any disclaimer of implied warranties) was unconscionable as the result of an unfair bargaining process and/or the terms of such express warranty were excessively one-sided. For instance, the failure or depletion of a button-cell battery can be expected to occur outside of the warranty period, however, the price to replace the gauge containing the button-cell battery ($62.98) *greatly* exceeds the replacement cost of a button-cell battery ($2.87).[8] Plaintiff and Class Members lacked the ability to negotiate more favorable terms, leaving them without substantial recourse in the event of a battery failure. As such, the express warranty was unconscionable and unenforceable.

111. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and the Classes are entitled to recover all damages permitted by law, together with any other relief the Court deems just and proper.

## COUNT II
### VIOLATIONS OF GEORGIA FAIR BUSINESS PRACTICES ACT
### (O.C.G.A. § 10-1-390, et seq.)

112. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

113. Defendants are each a "person" as defined by the Georgia Fair Business Practices Act ("Georgia FBPA"). O.C.G.A. § 10-1-392(a)(24).

---

[7] https://www.lawnmowerforum.com/threads/digital-fuel-hour-meter-stopped-working.77662/
[8] *See, e.g.,* Energizer Silver Oxide Button Cell Batteries (2 pack), available here:
https://www.walmart.com/ip/Energizer-377BPZ-2-Energizer-376-377-2pk/37300768?wl13=4504&wmlspartner=wlpa&selectedSellerId=0&sid=cf6f423e-91f1-4448-8732-b5e346dcb7ad

114. Plaintiffs and Class Members are "consumers" within the meaning of the Georgia FBPA. O.C.G.A. § 10-1-392(a)(6).

115. The purchase of the Class Mowers by Plaintiff and Class Members constituted "consumer transactions" as defined by the Georgia FBPA. O.C.G.A. § 10-1-392(a)(10).

116. The Georgia FBPA declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, O.C.G.A. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," *id*. §§ 10-1-393(b)(5), (7) & (9).

117. By failing to disclose the Defective nature of the Class Mowers to Plaintiff and Class Members, Defendants violated the Georgia FBPA, because Defendants represented that the Class Mowers had characteristics and benefits that they do not have, and represented that the Class Mowers were of a particular standard, quality, or grade when they were of another. *See* O.C.G.A. §§ 10-1-393(b)(5) & (7).

118. Defendants advertised the Class Mowers with the intent not to sell them as advertised, in violation of § 10-1-393(b)(9).

119. Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to owners and purchasers of the Class Mowers.

21

120. Defendants knew, by 2021 at the latest, and certainly before the sale of the Class Mowers, that they suffered from an inherent design Defect, and were not suitable for their intended use.

121. By 2021 at the latest, Defendants had exclusive knowledge of material facts concerning the existence of the Defect in its mowers. Furthermore, Defendants actively concealed this Defect from consumers by failing to offer Class Members a permanent solution to the Defect.

122. Defendants were under a duty to Plaintiff and Class Members to disclose the defective nature of the fuel gauge assembly, as well as the associated costs that would have to be repeatedly expended in order to have functioning fuel gauge in the Class Mowers because; (a) Defendants were in a superior position to know the true state of facts about the Defect in the Class Mowers; (b) Plaintiff and Class Members could not reasonably have been expected to learn or discover that the Class Mowers had the Defect until, at the earliest, the first instance of the fuel gauge cell battery dying; and (c) Defendants knew that Plaintiff and Class Members could not reasonably have been expected to learn or discover the Defect prior to its manifestation.

123. Defendants knew or should have known that their conduct violated the Georgia FBPA.

124. In failing to disclose the defective nature of the Class Mowers' Defect, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

125. The facts Defendants concealed from Plaintiff and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase a subject mower. Moreover, a reasonable consumer would consider the Defect to be an undesirable quality, as Plaintiff and Class Members did. Had Plaintiff and Class Members known

that the Class Mowers had the Defect, they would not have purchased a subject mower, or would have paid less for them.

126. Plaintiff and Class Members, like all objectively reasonable consumers, did not expect to receive a fuel gauge assembly with an internal button-cell battery that predictably depletes during ordinary use, while allegedly sealing, welding, embedding, or otherwise configuring the battery such that it could not be replaced in an ordinary, non-destructive, and economical manner.

127. As a result of Defendants' misconduct, Plaintiff and Class Members have been harmed and suffered actual damages including in that the Class Mowers' fuel gauge assembly requires replacement of the entire gauge assembly upon predictable battery depletion, even though the failed component was only a low-cost internal battery.

128. As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and Class Members suffered and will continue to suffer actual damages in that they have experienced and will continue to experience their mowers needing routine replacement of the entire gauge assembly upon predictable battery depletion, even though the failed component was only a low-cost internal battery.

129. Plaintiff provided Defendants with written notice of the Defect, breach, and resulting damages contemporaneously with, and no later than, the filing of this action, thereby satisfying any applicable notice requirement.

130. Thus, pursuant to O.C.G.A. § 10-1-399, Plaintiffs seek, in addition to equitable relief, actual and statutory damages, attorneys' fees and expenses, treble damages, and punitive damages as permitted under the Georgia FBPA and applicable law.

**COUNT III**

**FRAUD BY CONCEALMENT**

131.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

132.    Defendants concealed and suppressed material facts concerning the quality and nature of the MowerPlus fuel gauge in the Class Mowers, including the design, serviceability, and expected failure characteristics of the gauge assembly.

133.    Defendants concealed and suppressed material facts concerning the routine replacement of the entire fuel gauge assembly upon predictable battery depletion, even though the failed component was only a low-cost internal battery. Defendants further concealed the fact that the cell battery routinely reached its lifespan just after warranty period. Upon information and belief, Defendants knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Defect prior to purchasing the mowers, and relied upon this lack of disclosure to further promote payments for complete fuel gauge assemblies rather than low-cost cell batteries while concealing the true nature of the Defect from Plaintiff and Class Members.

134.    Upon information and belief, Defendants acquired knowledge of the Defect and its consequences through pre-production testing, durability testing, engineering evaluations, warranty claims, dealer reports, customer complaints, replacement-part sales data, post-sale monitoring, and other sources of information unavailable to consumers.

135.    Upon information and belief, feasible alternative designs existed that would have permitted replacement of the battery without requiring replacement of the entire assembly, including serviceable battery compartments, replaceable battery modules, or designs powered directly by the mower's electrical system.

136. Upon information and belief, Defendants knew before Plaintiff's purchase that the battery incorporated into the gauge assembly was a consumable component subject to predictable degradation and eventual failure through ordinary use and aging.

137. Upon information and belief, Defendants knew before Plaintiff's purchase that owners of the Class Mowers would eventually experience battery failure during the useful life of the mower and that the battery could not be separately replaced.

138. Upon information and belief, Defendants knew that consumers would be required to replace the entire gauge assembly despite the continued functionality of the remaining assembly components and despite the fact that the failed battery represented only a small fraction of the replacement assembly's cost.

139. Upon information and belief, Defendants knew that the non-serviceable design would foreseeably impose substantial replacement costs on consumers by requiring replacement of an entire assembly when only a low-cost battery component had reached the end of its useful life.

140. Upon information and belief, Defendants possessed superior and exclusive knowledge regarding the gauge assembly's design, serviceability, expected battery lifespan, and the consequences of battery failure.

141. Defendants had a duty to disclose the concealed facts because they possessed superior and exclusive knowledge of the Defect, the internal battery was not reasonably discoverable by consumers prior to purchase, and Defendants made affirmative representations concerning the quality, durability, reliability, and maintenance characteristics of the Class Mowers that were misleading without disclosure of the omitted facts.

25

142. Defendants knew that these facts were not known to, and could not reasonably be discovered by, Plaintiff and Class Members prior to purchase because the internal battery was sealed within the gauge assembly and its service life, failure characteristics, and replacement requirements were not disclosed in marketing materials, product literature, or point-of-sale information.

143. Defendants omitted these material facts in order to induce Plaintiff and Class Members to purchase the Class Mowers at full price and to prevent consumers from understanding that ownership would foreseeably require replacement of the entire gauge assembly due to failure of a low-cost internal battery.

144. Plaintiff and Class Members relied on Defendants' omissions and affirmative representations regarding the quality, durability, reliability, and serviceability of the Class Mowers in deciding to purchase the products.

145. Had Plaintiff and Class Members known the true facts regarding the non-serviceable battery and resulting replacement requirements, they would not have purchased the Class Mowers, would have paid less for them, or would have selected alternative products.

146. The omitted facts were material because they directly affect the value, usability, and expected maintenance costs of the Class Mowers, and a reasonable consumer would consider such facts important in deciding whether to purchase the product and at what price.

147. As a direct and proximate result of Defendants' concealment and omission of material facts, Plaintiff and Class Members suffered economic injury, including overpayment at the time of purchase and out-of-pocket costs associated with replacement of the gauge assembly.

148. Accordingly, Defendants are liable to Plaintiff and Class Members for damages in an amount to be proven at trial.

26

## COUNT IV
## UNJUST ENRICHMENT

149. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

150. This claim is pled in the alternative to Plaintiff's warranty and contract-based claims.

151. Plaintiff and members of the Classes conferred a direct and substantial benefit upon Defendants by purchasing John Deere riding mowers containing the subject gauge assemblies and by purchasing replacement gauge assemblies made necessary by the Defect alleged herein.

152. Defendants knowingly accepted and retained those benefits.

153. Defendants appreciated, knew, or should have known that Plaintiff and members of the Classes paid money for products that were not as represented and were worth less than the amounts paid because the subject gauge assemblies allegedly contained a low-cost internal battery that predictably depletes during ordinary use but could not be replaced in a simple, reasonable, and economical manner.

154. As a result of the challenged design, Plaintiff and members of the Classes were forced to pay for an entirely new gauge assembly when a trivial internal battery component failed.

155. Defendants retained revenues and other financial benefits from the sale of the Class Mowers, the subject gauge assemblies, and the replacement gauge assemblies.

156. It would be inequitable and unjust for Defendants to retain those benefits because Defendants allegedly designed, manufactured, marketed, distributed, and sold products that forced consumers to incur substantial replacement costs for what should have been a simple and inexpensive battery replacement.

157.    It would further be inequitable and unjust for Defendants to retain the monies paid by Plaintiff and members of the Classes because Plaintiff and members of the Classes would not have purchased the subject products, or would have paid less for them, had Defendants disclosed the true nature of the alleged defect.

158.    By reason of the foregoing, Defendants have been unjustly enriched at the expense of Plaintiff and the Classes, and principles of equity and good conscience require restitution, disgorgement, and/or other appropriate equitable relief.

159.    Plaintiff and the Classes therefore seek restitution and disgorgement of all profits, benefits, and other compensation wrongfully obtained by Defendants, together with all other relief permitted by law.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff, on behalf of herself and members of the Classes, requests that the Court enter judgment in their favor and against Defendants, awarding as follows:

A.  Certifying the Classes as proposed herein, designating Plaintiff as Class representative, and appointing undersigned counsel as Class Counsel;

B.  Declaring that Defendants are financially responsible for notifying the Proposed Class and Subclass Members of the pendency of this action;

C.  Award all actual, general, special, incidental, statutory, and consequential damages to which Plaintiff and Class Members are entitled;

D.  Scheduling a trial by jury in this action;

E.  Awarding pre and post-judgment interest on any amounts awarded, as permitted by law;

F.  Costs including reasonable attorneys' fees, court costs, and other litigation expenses; and,

28

G.  Any other relief the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of all those similarly situated, hereby request a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all claims so triable.

Dated: June 18, 2026                                  Respectfully Submitted,


                                                      */s/ Andre R. Belanger*
                                                      Andre R. Belanger (Ga. Bar. No. 216527)
                                                      **GO BIG INJURY LAW**
                                                      1 Glenlake Parkway NE
                                                      Suite 650
                                                      Sandy Springs, Ga 30328
                                                      T: 1-800-777-7777
                                                      F: 1-843-494-5536
                                                      E: andre.belanger@poulinwilley.com

29